## CITY OF ST. LOUIS v. WESTERN UNION TEL. CO.

(Circuit Court, E. D. Missouri, E. D.  July 9, 1894.)

1. MUNICIPAL CORPORATIONS—OPERATION OF ORDINANCE AS CONTRACT—ERECTION OF TELEGRAPH POLES IN STREET.

A city ordinance, authorizing the erection of telegraph poles in the streets, required any company erecting poles under its provision to file an agreement permitting the city to use "the top cross arm of any pole erected, or which is now erected," for telegraph purposes, free of charge. A company which had previously erected its poles in the streets filed the agreement required, and thereafter acquired and erected additional poles, and the city used many of the old and new poles. *Held*, that the ordinance, so accepted by the company, constituted a contract between the city and the company, which became executed when the city took the benefit thereof by using the poles; and the subsequent imposition by the city of a certain charge per pole for the use of the streets was a violation of the contract.

2. SAME—MUTUALITY OF CONTRACT.

Such ordinance reserved to the city the right to prescribe any other mode of conducting the wires over or under its thoroughfares. *Held*, that this did not destroy the mutuality of the contract.

3. SAME—RENTAL VALUE OF USE OF STREETS FOR POLES.

A city ordinance required a payment, in the nature of a rental, for the use of its streets by a telegraph company's poles, of five dollars per pole. *Held* that, although such ordinance was prima facie reasonable, that was no presumption that the amount of the charge was reasonable; and such sum, being enormously greater than the value of the average adjoining property, was unreasonable to exorbitancy.

This was an action of assumpsit by the city of St. Louis against the Western Union Telegraph Company. A trial by jury was waived, and the case was submitted on an agreed statement of facts, on which the circuit court rendered judgment for defendant. 39 Fed. 59. On writ of error, the judgment was reversed by the supreme court, and a new trial was ordered. 13 Sup. Ct. 485, 148 U. S. 92; 13 Sup. Ct. 990, 149 U. S. 465. The case was heard on the agreed statement of facts and additional evidence.

William C. Marshall, for plaintiff.

Dickson & Smith, for defendant.

PHILIPS, District Judge. This is an action of assumpsit, instituted April 7, 1888, to recover the sum of $22,635, under Ordinance

No. 12,733, passed March 22, 1884, by the plaintiff city, providing for the payment of $5 per telegraph pole "for the privilege of using the streets, alleys, and public places thereof." The case was tried in this court, without the intervention of a jury before Judge Thayer, resulting in a judgment for defendant. See 39 Fed. 59. On writ of error to the supreme court, this judgment was reversed, and the cause remanded for a new trial. See 148 U. S. 92, 13 Sup. Ct. 485; 149 U. S. 465, 13 Sup. Ct. 990. On remand, the cause has been heard before me, a jury again being waived, on the original agreed statement of facts and additional evidence.

Under the decision of the supreme court, two principal questions are involved on this retrial, left open for the development of additional proof: First, did section 8 of Ordinance No. 11,604, adopted February 11, 1881, on its acceptance by the defendant, and its erection and acquisition thereafter of additional poles, and the use by the city of both the old and new poles, which use yet continues, constitute a contract between the city and the company, which would be violated by the enforcement of said Ordinance No. 12,733? and, second, is the exaction of five dollars per pole, imposed under the last ordinance, so unreasonable that the court ought to interpose and set it aside?

Said section 8 is as follows:

"Any company erecting poles under the provision of this ordinance shall, before obtaining a permit therefor from the board of public improvements, file an agreement in the office of the city register, permitting the city of St. Louis to occupy and use the top cross arm of any pole erected, or which is now erected, for the use of said city for telegraph purposes, free of charge."

I am unable to agree with the contention of the learned counsel for the city that the first inquiry is precluded by the decision of the supreme court. It is as much open for admission of additional evidence, and for verdict on the facts, as the second proposition. All that can reasonably be inferred from the discussion by Mr. Justice Brewer is that, from anything appearing in the evidence then in the record, he was unable to find that the company, since the adoption of the Ordinance No. 11,604, had done any act under section 8, nor, of consequence, it must be assumed, had the city enjoyed the benefits thereof, so as to make a predicate for an executed contract containing the elements of an estoppel. After commenting on the absence of proof on this issue, he said: "It is unnecessary, however, to consider these matters at length, for on a new trial the facts in respect thereto can be more fully developed."

The evidence now shows that, of the 1,509 poles, the city, since 1881, has been using 834 for its wires, and fire "hoodlum" signal boxes, and in some instances has as many as 8 wires on one pole; and, since the adoption of Ordinance No. 11,604, the company has purchased 280 poles of another company, and erected 104 new poles, the top cross arms of which the city has, presumably, since occupied. Certainly, as to the 384 poles acquired and erected thus by the company, there ought to be no question but that this was an act in execution of the provisions of said section 8, and would clearly come

within the thought of Mr. Justice Brewer as constituting an estoppel. If so, I am unable to perceive how there can be any logical escape, on principle, from the application of the rule to the entire user by the plaintiff.

I understand the law to be that the grant of an easement or a use by the state or municipality like the plaintiff city, by ordinance, with a condition attached to be performed by the grantee beneficial to the grantor, when accepted by the grantee and acted on by both parties, constitutes a contract between them, from which neither party can recede, except upon the terms provided for or contemplated by the contract. Dill. Mun. Corp. (3d Ed.) par. 472; City of New Orleans v. Great Southern, etc., Co., 40 La. Ann. 41, 3 South. 533; Kansas City v. Corrigan, 86 Mo. 67; State v. Corrigan St. Ry. Co., 85 Mo. 264; City of Quincy v. Bull, 106 Ill. 342; Com. v. New Bedford Bridge, 2 Gray, 339; Chicago v. Sheldon, 9 Wall. 50; Coast-Line R. Co. v. Mayor, etc., 30 Fed. 646.

A grant is a contract. Chief Justice Marshall, in Fletcher v. Peck, 6 Cranch, 136, said:

"A contract is a compact between two or more parties, and is either executory or executed. An executory contract is one in which a party binds himself to do or not to do a particular thing. A contract executed is one in which the object of the contract is performed; and this, says Blackstone, differs in nothing from a grant. A contract executed, as well as one which is executory, contains obligations binding on the parties. A grant, in its very nature, amounts to an extinguishment of the right of the grantor, and implies a contract not to reassert that right. A party is therefore always estopped by his own grant."

In City of New Orleans v. Great Southern, etc., Co., supra, where the city, after granting the right to the telegraph company on condition of furnishing to the city certain free telephonic facilities, sought to impose a charge of five dollars per pole, the court, inter alia, said:

"Either she is bound according to the terms of her proposition accepted and acted upon by defendant, or she is not bound at all. Obviously, upon the clearest consideration of law and justice, the grant of authority to defendant, when accepted and acted upon, became an irrevocable contract; and the city is powerless to set it aside, or to interpolate new or more onerous considerations therein."

So in Rutland Electric Light Co. v. Marble City Electric Light Co., 26 Atl. 635, the supreme court of Vermont say:

"An ordinance authorizing a telephone company to maintain lines on its streets, without limitation as to time, for a stipulated consideration, when adopted and acted upon by the grantee by a compliance with its conditions, becomes a contract which the city cannot abolish or alter without the consent of the grantees."

See, also, Western Paving, etc., Co. v. Citizens' St. Ry. Co., 128 Ind. 525, 26 N. E. 188, and 28 N. E. 88; Gregsten v. City of Chicago (Ill. Sup.) 34 N. E. 426; Hudson Tel. Co. v. Jersey City, 49 N. J. Law, 303, 8 Atl. 123.

What difference can it make, in the application of this principle to this case, that prior to 1881 the defendant had erected most of its poles, and had suffered the city to use a few of them? That

was, at most, but a parol license, revocable at will. Prior to 1881, the city does not appear to have taken any account of the presence of the defendant's poles on its streets; but in February, 1881, the city, by ordinance, recognized the right of and authorized the company to be and continue on its streets and alleys. By Ordinance 11,604 it imposed upon the company the duty and obligation of keeping on deposit with the city treasurer the sum of $50, subject to the order of the street commissioner, to be used by him in restoring any sidewalk, gutter, street, or alley pavement displaced or injured in the erection, alteration, or removal of any pole of such company; and further requiring, in consideration of the grant of occupancy of the streets, that the company, before obtaining a permit therefor from the board of public improvements, should file an agreement with the city permitting the city to occupy and use the top cross arms of any poles to be erected, "or which is now erected, for the use of said city for telegraph purposes, free of charge." The company filed its agreement accordingly. This ordinance then became a binding contract, from which the company could not recede so long as its poles stood in the plaintiff's streets; and, when the city took the benefit thereof by using the defendant's poles, it became an executed contract. How, then, could the city, after thus binding the company to furnish it free of charge the use of its poles, in consideration of the grant made to the company and using the privilege for three years, subject the company to an additional charge of five dollars per pole, while still holding onto the top arms?

It is no answer to this to say that the number of wires placed on the poles by the city are greatly less than those employed by the company. If it is a contract, and that contract has been kept by the defendant, and the plaintiff has enjoyed the fruit thereof to the full measure of the requirements of the contract, it is enough. Furthermore, the uncontradicted evidence shows that it costs $23 to erect a pole and top cross arm, to say nothing of the expense of keeping them in repair and removing and replacing them to suit the city. This sum the city saved by using over 800 of the defendant's poles.

Nor does the evidence, by its weight and credibility, support the contention of counsel for the city that there has been but little change in the use of the defendant's poles by the city prior and subsequent to the adoption of the ordinance of 1881. On the contrary, it clearly enough shows that prior to 1881 the wires of the city were strung on the tops of houses, rendering their accessibility for repairs more inconvenient and expensive, and that they were afterwards mainly placed upon defendant's poles.

Nor can I accede to the proposition of counsel that no contract is predicable of Ordinance 11,604 and the acts done thereunder, for the reason that they are wanting in the quality of mutuality. The basis for this contention is section 9 of said ordinance:

"Nothing contained in this ordinance shall be so construed as to in any manner affect the right of the city in the future to prescribe any other mode of conducting such wires over or under its thoroughfares."

The effect of this was simply to reserve to the city the right to compel the company, if the city saw fit, to resort to a subterranean construction of its wires. If that ever should be done, the city's wires, of course, would have to come down when the company had to abandon them. But this action, if taken, is of the city's election. If it never so elects, so long as the defendant's poles stand, the right remains to the city, irrevocable by the company, to compel the company to maintain the top arm for the benefit of the city. In other words, the contract is a binding one of mutual rights and obligations, subject to the contingency, at the election of the city; and, if such contingency never arises, the mutual rights of the parties continue. How, then, does section 9 destroy the mutuality of the contract?

My conclusion is on this branch of the case that Ordinance 11,604, having been accepted by the defendant, subject to the condition imposed by section 8, and said condition having been performed by the defendant, and the plaintiff having received the benefit thereof, constitutes a contract between the parties, and that the imposition of the additional burdens sought to be enforced by Ordinance 12,733 is violative of the first contract, and for that reason the latter ordinance ought not to be enforced.

But, as it is altogether probable that this case will go further for final determination, I will proceed to consider and pass upon the second issue involved in this new trial, under my understanding of the decision of the supreme court.

It is held by the supreme court in this case that the five dollars per pole, imposed by Ordinance 12,733, is not a privilege or license tax, but is of the nature of a rental, for the use of so much of the streets and alleys of the city as is occupied by the company permanently with its telegraph poles. As the case had been tried below mainly on the question as to whether or not the imposition of this five dollars was a license tax, and therefore void, as being in contravention of the interstate commerce provision of the federal constitution, there was not, in the opinion of the majority of the court, sufficient evidence in the record to enable them to determine safely the question ultimately raised by defendant, whether the rental exacted was unreasonable, and further evidence was invited on this issue at the retrial.

Both at the trial and in his brief, counsel for the city plants himself upon the proposition that the sum fixed in the ordinance is prima facie reasonable and just, and the burden rests upon the company not only to overcome this presumption by a preponderance of evidence, but it should go further, to some indefinable extent, to warrant the court in declaring the ordinance void. If this charge of five dollars is warranted as a mere rental, there would be no escape, as a matter of common justice and practice, from the proposition that in the absence of an agreement with the occupant, or even an opportunity accorded by the city to negotiate with it, for a rental sum, the very utmost the city could claim, in common decency, is that the sum demanded by its ordinance should be reasonable. Why should the city in such strife be permitted by its own ordinance to make for itself a prima facie case?

No question is made of the well-established rule that, in all matters pertaining to the police regulation of municipalities, their ordinances, being of the nature of legislative discretion, are prima facie reasonable.   In the matter of licensing trades and avocations, and fixing the amount of permissible taxes therefor, in the very nature of things, the action of the governing board or legislative department, as to the amount thereof, is presumptively honest and just.   So, under section 888 of the Revised Statutes of the state, the city, in a case like this, under the power to regulate the presence of telegraph lines on its streets, is authorized to do three things: (1) To fix the place where the posts, piers, or abutments shall be located; (2) the kind of posts that shall be used; (3) the height at which the wires shall be run.   Hannibal v. Telephone Co., 31 Mo. App. 30, 31.   And under the decision of the supreme court in this case, under the power to regulate, the city may by ordinance require the company to pay for the use of such streets.   The city, in such case, is the sole judge of the necessity and wisdom of such an ordinance; and the ordinance making such requirement would be prima facie reasonable.   But as to the amount of the rental, which is the reasonable value of the use, and no more, the case is sui generis; and upon what principle of common right and justice the party demanding the rent should be permitted to establish for itself a prima facie value by adopting an ordinance, and throwing the whole burden of establishing its unreasonableness upon the defendant, is not apparent to my mind.   The defendant company is in the city, with its poles and wires on the streets, under the paramount authority of an act of the federal congress.   It comes as a governmental agency, in performing an important function in interstate commerce.   It neither asks, nor can the city demand, any permit or license to be and remain on such public highway.   It has the right to demand the use of the plaintiff's streets and alleys, and the plaintiff must submit to such use, with or without an ordinance. But, as the defendant occupies public property under the dominion of the city, the city has a right, by ordinance, to demand what?   Not such rental therefor as to its legislative body may seem just and proper, but such rental as may represent what is reasonable for the use of the territory appropriated.

So while the court, in this case, said an ordinance like that is prima facie reasonable, we are to look at what the learned justice said later on as to what extent that reasonableness should go; for in the final summing up of this question he said:

"Indeed, it may be observed, in the line of the thought heretofore expressed, that this charge is one in the nature of rental; that the occupation by this interstate company of the streets cannot be denied by the city; that all it can insist upon is, in this respect, reasonable compensation for the space in the streets thus exclusively appropriated.   And it follows, in the nature of things, that it does not lie exclusively in its power to determine what is reasonable rental.   The inquiry must be open in the courts."

According to what would be the logical sequence of the theory on which I think this question should be determined, where the parties are unable to come to an agreement and appeal to the court, the court, on hearing the evidence, if satisfied that the amount de-

manded by the city is unjust and unreasonable, should ascertain the reasonable rental value, and give judgment therefor.

But accepting as correct the contention of the plaintiff that its action must stand or fall on the proposition that if the court finds the ordinance, in respect of the assessment of five dollars per pole, to be unreasonable to exorbitancy, the plaintiff cannot recover at all, we proceed to consider the second proposition above indicated.

How is the court to arrive at this rental value? The usual ordinary method is to ascertain the customary annual rental of like property similarly situated, or its market value. In the latter case, 6 per cent. interest on the property capitalized would represent its rental value. But in this case the streets and alleys of a city have no market value predicable of like sales, as they, or any part thereof, are never sold. Nor is there any evidence that the streets and alleys, or any part thereof, were ever rented; for the reason, presumably, that such a thing as selling or renting a part of a street is unknown in commerce. Persons often obtain permission or license from municipalities to occupy for a time a portion of the streets or alleys, for which they pay a license tax. The question of fact under inquiry must therefore, necessarily, like any other similar circumstanced case at issue, be ascertained as nearly as may be by resort to the next best evidence. To this end, the court necessarily, in search of light, permitted the parties to indulge in a wide latitude in bringing to bear evidence upon this issue. Evidence was heard showing the valuation placed upon defendant's plant by the state; the cost of its maintenance, and the market value and the like of property on different streets of the city abutting on the lines of defendant's telegraph wires. The evidence shows that the average space occupied by each pole is approximately 15 inches in diameter. After hearing all the evidence, including sales of property actually made on the different streets, and the opinion of so-called "experts," I feel compelled to say that the rental charge for the spaces occupied by the defendant company is so enormously greater than that of the abutting property as to render this exaction absolutely unconscionable. Making every reasonable concession to the city on account of any conceivable inconvenience consequent upon the limited space occupied by 1,500 poles, distributed, as these are, over a wide extent of territory, and also taking into account the space occupied by the cross arms, and, if you please, for the wires in mid air between the poles, the charge by the city under this ordinance exceeds manifold the value of the average adjoining property.

The plaintiff, to mitigate this exaction, introduced some of its firemen, who testified that the presence of the wires, particularly in the business centers of the city, renders access by ladders to houses in cases of fire at times inconvenient and troublesome. But why this should enter into the estimation of the rental value to the city for the space occupied by the defendant is not apparent. Any injury or loss attendant thereon would result to the owner of the buildings, and the regulation of this matter would pertain to the police power of the city, to say nothing of the impracticability of approximately estimating a valuation by taking into account such casual or occasional incidents.

Again, plaintiff contends that the five dollars per pole would yield to the city less revenue than it obtains by assessment upon the gross earnings of the Bell Telephone Company in the city. That ordinance is not in evidence, but I infer from what is said in section 11 of Ordinance 12,733 that the ordinance is simply a tax "on the gross income for city purposes." In other words, it is simply an occupation tax. But the conditions of the two companies, in respect of their business, are so dissimilar as to render the comparison quite inadmisible. The business of the Bell Telephone Company is approximately intramural; so that the sum of its business is easily ascertainable, and its expenditures are confined to that locality. Not so with the defendant company. Its intramural business bears but an infinitesimal relation to that which begins from within, and vice versa. Hence the practical impossibility of arriving at the gross income of the company in the city was admitted by the city's able counsel at the trial to be the reason why the ordinance did not impose a tax on its gross income; and, inferentially, I presume that is the reason they call this a rental to accomplish the same results in raising a city revenue. Furthermore, the defendant's state and interstate business compels it to maintain its wires and offices over long stretches of territory where there is little income from the business; so that what comes to and goes from the city is depleted in supporting the outlying regions, which it must keep up in order to accomplish the ends of interstate commerce, and to assist the government in communicating with the national army.

At the trial, plaintiff introduced witnesses engaged in the business of advertising by posters, —in the picturesque business of placarding fences, walls, and posts, wherever permitted,—who testified that they would cheerfully give five dollars per pole for such advertising purposes. To say nothing of the nuisance of the spectacle of the streets of a city with poles plastered over with flaming, vari-colored handbills, as eye catchers, presenting pictures from a prize fight to a circus woman in the folds of a South American reptile, this is hardly a legitimate test of the rental value of such property. The very singularity and attractiveness of such displays give a factitious value to such use. The average billposter would pay five dollars a month for each tombstone in a graveyard; if he could use them as a fakir for advertising.

If recourse were permissible to the value of defendant's property on the streets, the disproportion between its value and this assessment is equally glaring. Under the laws of the state, the fixing of the valuation of property for assessment is imposed upon the state board of equalization, composed of the highest state officials. This board assessed defendant's property in St. Louis, in 1884, at $17,064.53; in 1885, at $19,623.60; in 1886, at $20,678.10; and in 1887, at $20,678.10. After collecting from the defendant the customary taxes, the city seeks to collect by this ordinance $7,545 per annum more on this plant. Allowing for the customary undervaluation, $7,500 would be 30 per cent. of its actual value; and this the city demands in addition to the privilege secured to it by the ordinance of 1881 of using defendant's poles for city purposes.

In Telegraph Co. v. Katkamp, 103 Ill. 420, which was a proceeding to condemn the right of way for telegraph poles, it was sought by the owner of the land to augment the value of the small spaces to be occupied by the poles by showing the probable inconvenience in plowing out at the point of the poles; but the court, after ascertaining the value per acre of the land, based its estimation upon the quantity of ground which would be occupied by the poles had the sum of it been placed in one continuous strip, and after ascertaining by this means that the value of this strip would, as compared to the acre value of the tract, amount to not more than $36, set aside a verdict for $38.50. The space occupied by 1,500 poles aggregates 18,000 square feet,—a space equal only to a lot 18x100 feet. The sum of $7,500, charged in this ordinance, represents a capital of $125,000. Perhaps there are pieces of ground at the business centers of St. Louis which might approximate these figures; yet the evidence of sales actually made during the period in question on streets where defendant's wires run does not present any such figures by from one hundred to many hundred per cent.

Willing, as the court is, to accord to the city the full measure, even "heaped up and running over," of the rental value of its highways used by the defendant, it ought not to permit it to take the pound of flesh, and a half pound more. For this reason, this issue is found for the defendant. Verdict and judgment accordingly for the defendant.