**MCI METRO ACCESS TRANSMISSION SERVICES, INC., Plaintiff/Appellant/Cross–Respondent,**

v.

**CITY OF ST. LOUIS, Defendant/Respondent/Cross–Appellant.**

**Nos. 69552, 69716.**

Missouri Court of Appeals,
Eastern District,
Division Three.

Feb. 11, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 20, 1997.

Application to Transfer Denied
April 29, 1997.

**636**

Leland B. Curtis, Curtis, Oetting, Heinz, Garrett & Soule, P.C., Clayton, Co–Counsel for Appellant.

Andrew Rothschild, Thomas P. Berra, Jr., Lewis, Rice & Fingersh, L.C., St. Louis, for Appellant.

James L. Matchefts, Michael A. Garvin, Associate City Counselors, St. Louis, for Respondent.

GRIMM, Judge.

In this case, both plaintiff MCI[1] and defendant City of St. Louis sought declaratory judgments and injunctions. The center of the dispute is St. Louis City Communications Transmission Systems ordinance 62,233. MCI claimed it is exempt from City's license fees, while City claimed otherwise.

Also, MCI alleged it was entitled to an injunction to require City to act on, and grant, its request for a construction permit. In contrast, City sought an injunction to prohibit MCI from operating its communications transmission system until it complied with the ordinance's requirements.

The trial court found that Western Union,[2] MCI's predecessor in interest, continued to have contractual rights stemming from an 1881 city ordinance. Further, it found that those rights were assignable.

However, it declared MCI's acquisition of Western Union's St. Louis rights void for noncompliance with a statutory requirement. Nevertheless, it granted MCI one year to have the acquisition "validated prospectively by an order of the Public Service Commission of Missouri." In addition, it restrained City from collecting any fees prescribed by the ordinance.

Both parties appealed. We hold that MCI's right to construct and operate conduits under prior ordinances has expired. We further hold that under the doctrine of primary jurisdiction, the Public Service Commission has exclusive jurisdiction to determine compliance with the statutory requirement. Therefore, the trial court lacked subject matter jurisdiction of that issue. We reverse and remand.

---

1. For ease of reading, we generally refer to plaintiff as MCI instead of MCI Metro Access Transmission Services, Inc. MCI also encompasses its immediate predecessors, Access Transmission Services, Inc. and Western Union ATS, Inc.

2. Western Union encompasses both Western Union Telegraph Company and its successor Western Union Corporation.

## I. Background

Western Union has operated in St. Louis for more than a hundred years. In 1879, the General Assembly issued its revised statutes. The provision pertinent to telegraph companies provides:

Companies organized under the provisions of this article, for the purpose of constructing and maintaining telephone or magnetic telegraph lines, are authorized to set their poles, piers, abutments, wires and other fixtures, *along, and across* any of the public roads, streets and waters of this state, in such manner as not to incommode the public in the use of such roads, streets and waters. Chap. 21, Art. V, § 879, RSMo 1879. (emphasis added).

Thereafter, on February 25, 1881, City adopted ordinance 11,604. It is titled, "An ordinance to regulate the erection of telegraph and telephone poles." Section 1 of that ordinance provides:

Any telegraph or telephone company ... is hereby authorized to set its poles, pins, abutments, wires and other fixtures *along and across* any of the public roads, streets and alleys of the city subject to the regulations hereinafter provided. (emphasis added).

The ordinance permitted City to occupy and use the top cross-arm of any pole free of charge. On March 17, 1881, City filed Western Union's acceptance of the ordinance's provisions.

In 1884, City adopted ordinance 12,733. This ordinance required telegraph companies to pay $5.00 per year for each pole in City's streets, alleys, and public places. When Western Union refused to pay, City sued for $22,635, the amount it claimed was due. *See City of St. Louis v. Western Union Telegraph Co.*, 39 F. 59 (C.C.E.D.Mo.1889).

Following remand, the court held that the 1881 ordinance created a contract between City and Western Union. Under that contract, City could not unilaterally change the terms and add a $5.00 per pole per year charge. Therefore, the court entered judgment in Western Union's favor. *City of St.*

*Louis v. Western Union Telegraph Co.*, 63 F. 68, 71–72 (C.C.E.D.Mo.1894); *aff'd.* 166 U.S. 388, 17 S.Ct. 608, 41 L.Ed. 1044 (1897).

While that case was pending on appeal, in 1889, the Missouri General Assembly amended its statute relating to telephone and telegraph companies. *See* Chap. 42, Art. V, § 2721, RSMo 1889. Two significant changes were made.

First, the clause "along, and across any of the public roads" was amended to read, "along, across *or under* any of the public roads." (emphasis added). In addition, the General Assembly added a proviso. It states:

Provided, any telegraph or telephone company desiring to place their wires and other fixtures under ground, in any city, they shall first obtain consent from said city through the municipal authorities thereof.

Western Union sought City's consent. On September 8, 1896, City enacted ordinance 18,680. Under this ordinance, telegraph companies were required to remove their poles and wires and place them underground in a specified downtown area [3] by December 31, 1898. They were authorized "to construct underground conduits and to place and operate wires, tubes and cables therein." This specific authorization was not limited to the downtown area. Rather, it extended throughout the city.

The ordinance required the companies to submit their plans to the Board of Public Improvements for its approval. The plans had to include "such ducts, manholes and appurtenances as the city may require for its police and fire circuits and telephone service ... to be constructed and maintained by the parties receiving the permit, and to be used by the city free of charge or cost of any kind."

The ordinance also contained a termination clause, § 604–P. It says:

The rights, privileges and powers conferred and authorized by this article shall cease and determine and become null and

---

**3.** The area was bounded on the east by the Mississippi River, on the north by Washington Avenue, on the west by 22nd Street, and on the south by Spruce Street.

void on the fifteenth day of April, nineteen hundred and forty.

On November 14, 1896, Western Union filed its letter of acceptance with the City Register. Its letter said it "hereby accepts in all respects the terms, conditions and obligations of ordinance No. 18,680, approved September 8th, 1896."

Western Union did not meet the 1898 deadline to place its wires underground downtown. City granted it several extensions. The last ordinance granting an extension furnished to us is dated January 1906 and granted an additional year.

The record is silent as to any conflicts until the 1980's. At that time, City enacted an ordinance which imposed a ten percent charge on Western Union's gross receipts. When Western Union did not pay, City sued. The trial court entered judgment for Western Union, which this court affirmed. *City of St. Louis v. Western Union Telegraph Co.,* 760 S.W.2d 577 (Mo.App. E.D.1988).

In 1990, Western Union sold its access transmission services to MCI. This sale included Western Union's access transmission services' physical assets, contracts, and agreements in St. Louis. Neither Western Union nor MCI advised City of this sale, which included MCI's right to use the Western Union name and logo.

In 1991, City enacted the ordinance which gives rise to this dispute. It regulates the communications transmission system in connection with City's public streets and rights-of-way. The ordinance requires corporations to obtain a license and to pay certain fees. MCI did not comply with the ordinance and City refused to issue construction permits to it. This litigation resulted.

## CITY'S APPEAL

### I. Expiration Provision in 1896 Ordinance

 In its first point, City alleges the trial court "erred as a matter of law in deciding that the parties waived the expiration provision" in the 1896 ordinance. The expiration provision is contained in § 604–P and provides that the "rights, privileges and powers conferred and authorized by this [ordinance]

shall cease and determine and become null and void" on April 15, 1940.

In its findings of facts and conclusions of law, the trial court stated:

Notwithstanding the termination provisions of Section P–604 of Ordinance 18680, the Court concludes that the conduct of the parties during the succeeding 50 years clearly establishes that [1896] Ordinance 18680 is a permanent modification of [1881] Ordinance 11604, and *§ 604–P has been waived by both parties.* See *Hook v. Bowden,* 144 Mo.App. 331, 128 S.W. 261 (1910). (emphasis, brackets, and dates added).

 We first observe that MCI does not contend that City did not have authority to impose a 45–year limit on the rights given to Western Union or that the limitation was unreasonable. Cities have the right to impose reasonable conditions in its ordinances. Moreover, where, as here, the corporation seeking the right "agreed to the conditions which the city imposed, [it] is estopped from now saying the conditions are not reasonable." *See In re Topping Avenue,* 187 Mo. 146, 86 S.W. 190, 192 (Div. 2 1905).

We next observe that in its petition, MCI did not plead waiver of § 604–P of the 1896 ordinance. Although the petition identifies the 1896 ordinance, MCI did not plead that it claims any benefits from it. Rather, throughout its petition, MCI alleges it operates in the City pursuant to the 1881 ordinance and that it "enjoys the rights, benefits and privileges of the 1881" ordinance.

Moreover, in City's post-trial brief for the trial court, it argued that MCI's right to install or use conduit free of charge expired in 1940. In reply, MCI did not argue waiver of that provision. Rather, it contended that the 1896 ordinance, and its 1940 expiration date, "in no way impacted or undermined [MCI's] rights under the 1881 [ordinance] to use City rights-of-way without charge."

 We turn now to the merits of City's point that it did not waive the 1940 expiration date. Waiver is founded upon the intentional relinquishment of a known right. *Brown v. State Farm Mut. Auto. Ins. Co.,* 776 S.W.2d 384, 386 (Mo.banc 1989). It involves both knowledge and intent. *Id.* at 387.

Nothing in the record would support a finding of express waiver of the ordinance's time limit. Nor does MCI so contend. Rather, MCI argues that City impliedly waived the 1940 expiration date.

 To establish implied waiver from conduct, the conduct must be clear, unequivocal, and decisive, showing a purpose to relinquish the right. *Meyer v. Brown*, 312 S.W.2d 158, 162 (Mo.App. W.D.1958); *Heintz v. Swimmer*, 811 S.W.2d 396, 399 (Mo.App. E.D.1991). The conduct must be "so manifestly consistent with and indicative of an intention to renounce a particular right or benefit that no other reasonable explanation" is possible. *Steinberg v. Fleischer*, 706 S.W.2d 901, 905 (Mo.App. E.D.1986).

Numerous cases discuss implied waiver. However, no case cited to us applied that concept to a city or municipal corporation. Here, in support of its finding of waiver, the trial court cited *Hook v. Bowden*, 144 Mo. App. 331, 128 S.W. 261 (S.D.1910). However, *Hook* involves an express waiver, not an implied waiver.

In *Hook*, the city adopted an ordinance granting Bowden the right to construct and operate a telephone system. *Id.* The original ordinance contained a clause that the ordinance would be void unless Bowden had the system in operation within six months. *Id.* 128 S.W. at 262. Bowden did not meet that deadline.

At the eighth month, he asked the city to extend the time limit an additional six months. *Id.* The city's minutes reflect that Bowden's request was unanimously granted. *Id.* at 264. Thereafter, Bowden purchased a switchboard and other supplies, erected a pole, and began to string wire. *Id.* Hook, a competitor, then filed suit and sought an injunction, which the trial court denied.

In affirming, the *Hook* court expressed several reasons for its decision. First, it noted that the city recognized the continuing validity of the ordinance, extended its operation, "and waived thereby any forfeiture." *Id.* at 265. Further, it recognized that the ordinance's time limit "could not be collaterally attacked" by Hook. *Id.*

*Hook* is not applicable. Here, unlike *Hook*, City did not take formal action and recognize the continuing validity of the ordinance. Nor did it extend its operation by resolution or ordinance. Moreover, in *Hook*, the attack on the time limit was a collateral attack by a third party, not, as here, a direct attack by City.

 We conclude that City has not waived the 1940 expiration date of the 1896 ordinance. Nevertheless, MCI argues that even if this conclusion is reached, it is still entitled to operate and construct underground conduit. In its brief, MCI contends that 1881 "Ordinance No. 11604 granted Western Union (and subsequently MCI Metro) the right to operate in City rights-of-way without charge. The fact that those rights were required later by the City to be exercised below ground is not the issue."

Contrary to MCI's position, the 1881 ordinance 11,604 did not give Western Union carte blanche to use the rights-of-way as it desired. Rather, that ordinance granted Western Union authority "to set its poles, pins, abutments, wires and other fixtures along and across any of the public roads, streets and alleys of the city."

Nothing in that ordinance authorized Western Union to place its wires underground. Nor did Missouri's enabling statute for that ordinance, Chap. 21, Art. V, § 879, RSMo 1879, permit any use other than "along and across."

Not until 1889 was Missouri's enabling statute amended to permit wires to be placed *under* public roads. Chap. 42, Art. V, § 2721, RSMo 1889. Further, as to placement of wires underground in cities, that statute required telegraph companies to "first obtain consent from" City.

Seven years after the enabling statute was adopted, City enacted 1896 ordinance 18,680. That ordinance contains several significant sections. First, § 604–A prohibited electric wires, tubes, and cables above street surfaces in a specified downtown area after December 31, 1898. Second, § 604–C declared any poles or wires in that area above the street after that date were "deemed an obstruction to and encroachment on the public high-

ways." Any corporation owning those poles and wires who permitted them to remain in place after that date was guilty of a misdemeanor. § 604–D.

■ We digress from the ordinance to note that this ordinance further demonstrates Western Union did not have carte blanche on City's rights-of-way. Prior to this ordinance, Western Union had the right throughout the city to place its poles above ground. This 1896 ordinance reduced Western Union's right to do so. Such was within City's rights. *See Western Union Telegraph Co. v. Pendleton,* 122 U.S. 347, 7 S.Ct. 1126, 30 L.Ed. 1187 (1887) (cities have the power to make all necessary provisions respecting poles and wires "which the comfort and convenience of the community may require." 122 U.S. at 359, 7 S.Ct. at 1129, 30 L.Ed. at 1190); *see also, Western Union Telegraph Co. v. City of Richmond,* 224 U.S. 160, 32 S.Ct. 449, 56 L.Ed. 710 (1912) (requirement to remove poles and wires in a certain area recognized).

We return to 1896 ordinance 18,680. Under the previously noted sections, companies were only required to remove their above-surface poles and wires in the downtown area. However, § 604–E granted them authority to "construct underground conduits and to place and operate wires, tubes and cables therein ... under the surface of *any* of the streets, alleys or public places" of the city. (emphasis added).

On November 14, 1896, Western Union filed its acceptance of ordinance 18,680. Its letter of acceptance states that it "accepts in all respects the terms, conditions and obligations" of the ordinance. That acceptance included the April 15, 1940 termination date.

MCI next argues that in a 1906 ordinance, City "specifically recognized that [later ordinances] could not impair Western Union's existing contractual rights vis-a-vis the City." MCI refers to ordinance 22,194. This ordinance granted Western Union a further extension of the December 31, 1898 deadline to remove its downtown poles and wires.

In addition, the ordinance required Western Union to file a $50,000 bond. MCI's argument is based on a portion of the ordinance concerning the bond's conditions. In addition to other conditions, the ordinance provided that the giving of the bond:

shall not be considered as a waiver of any of the rights of said company under and by virtue of [the decision in *City of St. Louis v. Western Union Telegraph Co.,* 166 U.S. 388, 17 S.Ct. 608, 41 L.Ed. 1044 (1897)], which said decision affirmed the decision in the same case in the United States Circuit Court for the Eastern Division of the Eastern District of Missouri, reported in [63 F. 68], in which it was ruled that a certain charge of five dollars per pole on the poles of the said defendant company was unreasonable.

MCI contends that the quoted language is a recognition by City that "Western Union retained the basic right to operate in City rights-of-way without charge." As previously noted, this contention is overbroad. As the above quote indicates, the court ruled that a five dollar per pole charge was unreasonable.

The case cited in the above quote was originally decided June 19, 1889. (see introductory notes to *City of St. Louis v. Western Union Telegraph Co.* at 63 F. 68 and 39 F. 59.) At that time, neither Missouri's enabling statute nor City's ordinance authorized corporations to place wires *under* streets. Missouri first authorized this in 1889; City in 1896. The basic right which Western Union had in the rights-of-way before 1896 did not include underground rights.

We conclude that City did not waive the April 15, 1940 termination provision and MCI is not entitled under the original 1881 ordinance 11,604 to construct and operate underground conduits. However, that does not end our inquiry. The parties, in fact, did continue their relationship after April 15, 1940.

■ The 1896 ordinance 18,680, as accepted by Western Union, created a contract between City and Western Union. *See e.g. Bowers v. Kansas City Public Service Co.,* 328 Mo. 770, 41 S.W.2d 810 (Div. 1 1931). The ordinance/contract is conceptually similar to, and has many of the same attributes as, a lease.

In the ordinance, City authorized Western Union "to construct underground conduits and to place and operate wires, cables and tubes therein" on its rights-of-way. In exchange, i.e. as consideration, Western Union agreed to construct and maintain ducts, manholes, and appurtenances as required by City "for its police and fire alarm circuits and telephone service ... free of charge or cost of any kind." The term of the agreement was from 1896 to April 15, 1940.

■ Not unlike other parties to leases, City and Western Union continued to abide by the agreement after its term expired. In effect, Western Union was a holdover tenant. As such, so long as both agreed, the relationship could continue.

■ However, the election as to whether Western Union could continue was solely City's. Certainly, Western Union has no right to a declaration that, because City did not enforce the 1940 termination date, it acquires a permanent "holdover" right to use City's rights-of-way for its underground conduit and wires.

■ Nor does MCI's offer to make its underground conduits available to City create a permanent holdover right. If such were the law, any tenant could continue to holdover under the existing terms by merely continuing to pay (or offer to pay) the previously agreed amount of rent.

■ After 1940, Western Union, and later MCI, continued to provide City with the free use of its underground conduits. Western Union's business evolved, and technological advances required it to change. As the trial court stated, "in common with everyone else, the City had less and less need" for Western Union's facilities.

However, it was not until the summer of 1993 that City abandoned all use of the conduits. Thus, City cannot argue that it did not acquiesce in Western Union's holding over before 1993. Nor could City maintain that it did not receive its bargained for consideration from 1940 through 1993.

Those facts, among others, distinguish this case from our 1988 decision, *City of St. Louis v. Western Union Telegraph Co.*, 760 S.W.2d 577 (Mo.App. E.D.1988). That case involved City's attempt to collect a ten percent charge on Western Union's gross receipts. At that time, we noted that City continued to use Western Union's "underground cables for fire alarm purposes" and "Western Union has not charged City for the use of these cables." *Id.* at 581.

We acknowledge that in 1991, City adopted a Communications Transmission Systems ordinance. The application of that ordinance to MCI is not raised in any point and is not before us. Thus, we express no opinion concerning it.

## II. Refusal to Declare Forfeiture

■ In its second point, City alleges the trial court affirmatively found that MCI breached ordinance 18,680. After so finding, City contends the trial court erred in "refusing to enforce the mandatory forfeiture penalty contained in" that ordinance.

Section 604–S of that ordinance provides:

[that no corporation] shall have the right or privilege to lease or sublet space within such conduits or to use such conduits for purposes other than required by the individual needs of the ... corporation so building such conduits. Any violation of this clause shall be deemed a misdemeanor and shall cause a forfeiture of all the rights and privileges granted hereunder.

The trial court found that Western Union operated under ordinance 18,680 for almost one hundred years. During that time, Western Union "entered into a total of five subleases or license agreements with railroads and other utilities to permit usage of Western Union conduit. The revenue yielded by these arrangements seems to have been insignificant."

After making these and other findings, the trial court questioned whether these arrangements were such a material breach "to warrant the drastic measure of forfeiture." It declined to so rule, suggesting that a better way to test the question was through a quo warranto action.

■ "The materiality of a breach is usually a question of fact." *McKnight v. Mid-*

*west Eye Institute of Kansas City, Inc.,* 799 S.W.2d 909, 915 (Mo.App. W.D.1990). On the record before us, we cannot hold that the record does not support the trial court's finding and its refusal to order forfeiture. Point denied.

### III. Assignment of Rights

■ In its final point, City alleges the trial court erred "in validating Western Union's purported assignment of its rights under the 1881" ordinance. It contends the rights were not assignable and the assignment should have been declared void as a matter of law.

■ The 1881 ordinance 11,604 granted authority to any "telegraph or telephone company duly incorporated according to law" to set poles on its streets. The ordinance does not preclude assignment, nor have we been directed to any applicable statutory or constitutional provision forbidding assignment. In the absence of such prohibitions, it is generally held that assignments are permissible. *See e.g. Lawrence v. Hennessy* 165 Mo. 659, 65 S.W. 717 (Div. 1 1901); 12 E. McQuillin *The Law of Municipal Corporations* § 34.46 (3rd ed. 1995). Point denied.

### MCI'S APPEAL

In its sole point, MCI alleges the trial court erred in finding that Western Union's transfer of contractual rights to MCI was void for non-compliance with § 392.300.1.[4] It contends the trial court lacked subject matter jurisdiction to consider the applicability of that section. MCI argues that "the Public Service Commission [PSC] has primary and exclusive jurisdiction to determine what transactions require its approval."

Section 392.300.1 provides:

No telecommunications company shall hereafter sell, assign, lease, transfer, mortgage or otherwise dispose of or encumber the whole or any part of its franchise, facilities or system, necessary or useful in the performance of its duties to the public

... without having first secured from the commission an order authorizing it so to do. Every such sale, [etc.] ... made other than in accordance with the order of the commission authorizing the same shall be void.

\* \* \* \* \* \*

Nothing in this subsection contained shall be construed to prevent the sale, lease or other disposition by any telecommunications company of a class designated in this subsection of property which is not necessary or useful in the performance of its duties to the public, and any sale of its property by such company shall be conclusively presumed to have been of property which is not useful or necessary in the performance of its duties to the public, as to any purchaser of such property in good faith for value.

City apparently raised the applicability of this statute as an affirmative defense.[5] The trial court found that Western Union and MCI knew of § 392.300 "and chose to ignore it." Among its findings, the trial court found:

1. Western Union and MCI were both telecommunications companies within the meaning §§ 386.020(42) and 392.180.

2. MCI's acquisition of Western Union's St. Louis franchise required PSC approval unless the transaction comes within the "conclusively presumed" provision of § 392.300.1.

3. Western Union's St. Louis assets were "necessary or useful" within the meaning of § 392.300.1.

4. MCI was not a purchaser in good faith for value.

5. Western Union's transfer of its St. Louis assets was void for failure to comply with § 392.300.1.

The trial court then found that the parties' failure "to comply with § 392.300 makes the March 8, 1990 transfer of the St. Louis fran-

---

4. All statutory references are to RSMo 1994 unless otherwise indicated.

5. Briefs of both parties state that City raised this issue as an affirmative defense. That defense is not raised in either the answer or amended answer by interlineation furnished us. However, in view of the position taken by both parties, we will treat it as validly raised.

chise from Western Union to MCI void." However, the trial court further found that "the omission can be remedied by Public Service Commission approval." It then restrained City for one year from enforcing ordinance 62,233 and gave MCI one year to obtain PSC approval for the 1990 sale.

■ On appeal, MCI contends that the trial court lacked subject matter jurisdiction to consider the applicability of § 392.300. It points to Missouri statutes and case law that give the PSC primary and exclusive jurisdiction to consider the applicability and effect of § 392.300.1 on Western Union's sale to MCI. MCI points generally to Chapter 386 concerning the PSC and specifically to § 386.250, which provides:

> The jurisdiction, supervision, powers and duties of the public service commission herein created and established shall extend under this chapter:
>
> \* \* \* \* \* \*
>
> (2) To all telecommunications facilities, telecommunications services and to all telecommunications companies so far as such telecommunications facilities are operated or utilized by a telecommunications company to offer or provide telecommunications service between one point and another within this state or so far as such telecommunications services are offered or provided by a telecommunications company between one point and another within this state. . . .

If a person or corporation feels aggrieved by anything done or not done by a telecommunications company, that person or corporation may file a petition or complaint with the PSC. § 386.330.2. Upon receipt of a complaint, the PSC forwards it to the company, requiring it to either satisfy the complaint or answer in writing. If the company fails to rectify the wrong, the PSC investigates and takes such action "as the facts justify." *Id.*

MCI purchased Western Union's St. Louis assets in March 1990. At that time, neither City nor apparently anyone else filed a complaint with the PSC concerning the transaction. The failure to act is understandable.

When the transaction occurred, neither Western Union nor MCI notified City. Moreover, MCI's purchasing company was named "Western Union ATS" and was permitted to use Western Union's logo. Thus, from outward appearances, Western Union continued to operate in 1990 as it had for the previous 100 years.

In 1993, Western Union ATS changed its name to Access Transmission Services, Inc. Subsequently, it changed to its present name MCI Metro Access Transmission Services, Inc.

Prior to the trial of this matter, City did not file a complaint with the PSC as permitted by § 386.390. That section permits City and other organizations to complain to the PSC about "any act or thing done or omitted to be done" by any public utility or corporation. At oral argument, neither party could point to any statute placing a time limit on filing such a complaint.

Nor did the PSC file any action against MCI under § 386.360. That section authorizes the PSC to file suit whenever it has the opinion that a public utility or corporation is doing anything "contrary to or in violation of law."

Thus, the situation before the trial court was that no one—MCI, Western Union, City, or even the PSC—asked the PSC to consider the 1990 transaction between Western Union and MCI. Rather, as indicated, City raised § 392.300 as an affirmative defense.

■ Missouri has long recognized the doctrine of primary jurisdiction. Under this doctrine, courts generally will not decide a controversy involving a question within the jurisdiction of an administrative tribunal until after the tribunal has rendered its decision. *Killian v. J & J Installers, Inc.*, 802 S.W.2d 158, 160 (Mo.banc 1991). This policy of self-restraint applies (a) where administrative knowledge and expertise are demanded to determine technical, intricate fact questions and (b) where uniformity is important to the regulatory scheme. *Id.*

This doctrine was applied in *State ex rel. Cirese v. Ridge*, 345 Mo. 1096, 138 S.W.2d 1012 (1940). There, plaintiff utility company sought an injunction in circuit court against

defendant power and light company. *Id.* 138 S.W.2d at 1013. Our supreme court directed the trial court to dismiss plaintiff's petition. *Id.* at 1016.

The supreme court said that if defendant power and light company was unlawfully operating, plaintiff could file a complaint with the PSC. *Id.* at 1015. If either party was dissatisfied with the PSC's ruling, that party could seek review in the courts. *Id.* The supreme court concluded that it adhered "to the theory of the commission's exclusive jurisdiction in the first instance." *Id.* at 1016.

Nevertheless, City argues that it could "attack the validity of a transfer of PSC-regulated facilities as an affirmative defense against claims by a purchaser who seeks to enforce rights purportedly acquired via the transfer." For support, City primarily relies on *Webster v. Joplin Water Works Co.*, 352 Mo. 327, 177 S.W.2d 447 (Div.2 1944).

In *Webster*, trustees of a dissolved water works company alleged that defendant Joplin Water Works appropriated its customers and business, thereby destroying its business. Defendant's answer alleged that the sale from Oscar Webster to the now dissolved water works company was void, citing a statute similar to § 392.300. *Id.* 177 S.W.2d at 451. The trial court dismissed the petition, and our supreme court affirmed.

City urges that *Webster* is controlling because the trial and supreme court both considered the application of a statute similar to § 392.300. Further, it points out that the defendant there raised virtually the same issue MCI raises here, which the supreme court denied.

City's contention overlooks a vital difference between *Webster* and the case before us. In *Webster*, the supreme court noted that plaintiffs' petition charged, and plaintiffs' counsel admitted, that all the property damaged by defendant "was public utility property useful and necessary at said time in the conduct of the water utility business in the territory served." *Id.* at 450. Thus, neither the trial court nor the supreme court was required to make any factual determination as to whether the assets transferred were of the kind requiring PSC approval.

In contrast, MCI never admitted that the property Western Union transferred to MCI was "necessary or useful in the performance of [Western Union's] duties to the public." *See* § 392.300.1. Moreover, MCI offered evidence that it did not believe the statute was applicable because of the requirement that the property be necessary or useful for performance of Western Union's "duties to the public." Resolution of that factual issue requires the PSC's knowledge and expertise.

Thus, unlike *Webster*, here the trial court determined this disputed issue. The trial court found that Western Union's St. Louis assets were "necessary or useful" within the meaning of § 392.300.1.

*Main Line Hauling Co. v. Public Service Commission*, 577 S.W.2d 50, 51 (Mo.App. W.D.1978) also recognized the doctrine of primary jurisdiction. In that case, the court held that the doctrine did not apply because "the substantive issue presently for consideration can be resolved as a pure question of law." *Id.* Its holding does not aid City because, as previously noted, this case does not involve only a question of law. Thus, we grant MCI's point.

We reverse the trial court's judgment and remand for further proceedings consistent with this opinion. One-half of the costs assessed to each party.

CRAHAN, P.J., and HOFF, J., concur.